Neither a descent cast, nor the statute of limitations, will bar, or affect the right of a remainder-man, or reversioner, during the continuance of the particular estate; nor will the acts or *laches* of the tenant of the particular estate, affect the party entitled in remainder. An entry to avoid the statute, must be an entry for the purpose of taking possession. What acts amount to an adverse possession, or a disseisin.

JACKSON, *ex dem.* HARDENBERGH and others, *against*
D. L. SCHOONMAKER.

THIS was an action of ejectment for lands in the town of *Rochester;* it was tried at the *Ulster* circuit, before Mr. Justice *Van Ness,* and a struck jury; eight of the jurors having been on a *view* of the premises.

The plaintiff offered in evidence a will of *Josephat Dubois,* dated 4th *September,* 1757, and it was proved by showing that the witnesses were dead, and proving their hand-writing; and that the testator died on the 12th of *September,* 1757. The Judge decided, that an estate for life, was thereby given to *Fijatje Dubois,* the testator's widow; and after her death, the fee of the lands was given to his three daughters; *Maria,* the wife of *Hendricus Hornbeck,* who died without issue; *Cornelia,* wife of *I. G. Hardenbergh,* one of the lessors; and *Catharine,* since married to the other lessor, *Jonas Hasbrouck.* The two other sisters were married in the lifetime of their father. *Catharine* married shortly after his death; but whether under age, or not, did not appear. *Maria* died after her husband, leaving a mother. By the will, if either daughter died, without issue, her share, was to go, to the surviving sisters, or sister, in fee. The testator's widow, died about the autumn of 1792.(*a*)

(*a*) The words of the will were as follows: "I further give, devise and bequeath unto my three well beloved daughters, as namely, *Maria Hornbeck,* wife of *Hendricus Hornbeck, Cornelia,* wife of *Johannis Gerard Hardenbergh,* and *Catharine Dubois,* all my lands, tenements, &c. to be equally divided among them: each the just third part thereof, *six weeks after the decease of my* dearly beloved wife *Fijatje Dubois,* or as soon as she marries, *she is to quit all claim,* of this my above-mentioned estate; but as long, as she remains my widow, she is to remain in full possession, and master, &c. Provided nevertheless, if any of my above-named daughters, should come to die, or decease, without heirs, of their own issue, then their, or either of their shares, shall be equally divided among the survivors of them, or each, or either of their heirs."

A deed from *Leonard Cole*, to *Josephat Dubois*, dated 30th *October*, 1751, and acknowledged, was read in evidence ; and the defendant proved, that the grantor was reputed in the family to have been the eldest son, and heir at law of *Leonard Cole*, senior ; and that his father was dead.

The plaintiff then gave in evidence, the record of a deed, from *Rosekrans*, *De Witt* and *Wynkoop*, trustees of *Rochester*, to *Leonard Cole*, dated 17th *November*, 1714, acknowledged, 30th *December*, 1751, by *De Witt*, one of the grantors, before a judge of the court of common pleas, at his chambers.

The plaintiff also produced a deed, from *Leonard Cole*, son and heir of *Leonard Cole*, senior, to *Josephat Dubois*, dated 8th *November*, 1730, for other lands, than the premises, but reciting them to be a part and parcel of the land of *Leonard Cole*, senior.

The plaintiff then proved, by *Guesbert Krom*, a witness, aged 85 years, that from the age of 13 to 33, he lived about half a mile north of the premises ; and when about 18 years of age, he saw a patch of clearing and a *shepple sowing*, along the south side of *Stoney Kill*, near where young *Jacobus Schoonmaker* now lives, and upon which it appeared that corn had before been planted ; that young *Leonard Cole* lived where *Jonas Hasbrouck* now lives.

*Jacob Quick*, aged 48, testified, that the servants of *Fijatje*, the widow of *Dubois*, some time before her death, cut wood, and made rails, on the south side of *Stoney Kill*, and between that and the *Mill Brook*, nearly south of young *Jacobus Schoonmaker's* ; and that *Jonas Hasbrouck*, one of the lessors, who lived with his mother-in-law, the said widow, had made mill-stones, south of the *Creek Mill*, 19 or 20 years ago ; and that the inhabitants of *Rochester*, claimed the right of cutting wood,

and breaking stone, on the lands in *Rochester* not in-closed.

*Samuel Freer* testified, that he had, by permission of the widow *Dubois*, cut wood, south of *Stoney Creek*, in 1790, or 1791, and that his father, who was a freehold-er, and inhabitant of *Rochester*, had also cut wood there by her permission.

*John A. De Witt* testified, that he had made a map of the tract, comprehended in the deed from the trustees of *Ro-chester*, to *Leonard Cole*, senior, on which the *Stoney Kill*, *Mill Brook* and *Sander's Kill*, were laid down from ac-tual survey; and that the premises in possession of the de-fendant were between *Stoney* and *Mill Kill*, and the plain-tiff claims them by virtue of the deed, from the trustees of *Rochester* to the elder *Cole*, which comprehended all the land between the *Stoney* and *Sander's Kill*, from their junction, up to *David Dubois's* south-west corner, on the *Stoney Kill*, and a line from thence, south, to the *Sander's Kill*. In 1792 he surveyed the said tract, and found a marked tree, which was boxed in presence of the jury; and the marks appeared to be 51 years old, and the tree 180 years. This tree answered to the de-scription in the plaintiff's deed. There were two other trees, apparently marked at the same time.

The plaintiff having here rested his cause, the de-fendant's counsel moved for a nonsuit, on the ground, that no title had been shown in *Leonard Cole*, senior, and that no possession had been proved; but the motion was overruled.

The defendant proved by *F. Schoonmaker*, aged 69 that captain *Joakim Schoonmaker*, was one of the trus-tees, named in the patent of *Rochester*, and lived on the north side of *Stoney Creek*, within a quarter of a mile of it, where his son *Joakim* afterwards lived; that the three sons of *Joakim*, had, as long ago as he could recol-lect, established divisions between their respective parts

on the land possessed by them, on the south side of the *Stoney Creek;* they possessed lands, improved to the *Mill Creek;* some of the family had a fence beyond it, extending to *Sander's Kill. John,* a grandson of captain *Joakim,* was in possession of the land occupied by the defendant; and was in possession when the witness was 10 or 12 years old; some of his fence was along the *Stoney Kill,* and south-west from the *Stoney Kill,* to the *Mill Creek,* nearly as the fence now runs; south of this, the land was claimed, as part of the 180 acres granted to captain *Joakim,* by the town of *Rochester. John* died in possession, before, or during the war. *John,* the son of captain *Joakim,* had once cleared land along the *Stoney Kill,* being about 20 or 30 acres, the outside fences of which are now the same as when he first knew it. He had also seen a fence, extending to *Mill Creek,* from the *Stoney Kill,* between the defendant and *Jacobus Schoonmaker;* it was made of lopped trees; and, in some places, had stakes and riders. He did not know that the fence, forming *John's* western boundary, extended south to the *Mill Creek;* but he knew well, that the fence between *Joakim* and *John,* extended to the *Mill Creek:* all the fences appeared to be of some years standing. There was a road through the defendant's possession, which crossed the *Mill Creek,* and the low land adjoining the *Stoney Kill,* was cleared when he first knew it.

*John Depuy,* aged 68 years, testified, that he lived near the family of the *Schoonmakers;* that captain *Joakim,* had seven sons; that he has known the lands south of the *Stoney Creek,* from his earliest remembrance; that the low lands, in possession of three of those sons, appeared to be ancient clearings, when he first knew them; that he knew the defendant's possession, when a boy; it was then in possession of captain *Joakim's* son *John,* who died there, before the war, and was succeeded by his son, who was succeeded by the defendant; that the

outside fences of the farm stand now where they stood when *John* settled there; he was present when the proprietors of the *Grote Transport* tract divided it; that the defendant's *farm has been in fence, as it now is, as long as he could remember;* that the *low lands* have been improved as long as any in *Rochester;* the descendants of captain *Joakim,* claimed the north and south sides of the *Stoney Kill,* as their own; that the cleared lands were along the *Stoney Creek,* which is *low land;* the *low lands* were in fence in 1768, when the *Grote Transport* tract random line was run; that 50 *years ago,* he followed the outside fence of *John Schoonmaker's* farm to the *Mill Creek,* and it was made of trees cut down, with cross stakes and riders, and high enough to keep out cattle; that the upland possession of the defendant, was cleared a great many years ago; that the inhabitants of *Rochester* cut wood, and made mill-stones, where they pleased, on the unimproved lands, not in fence, and between *Stoney* and *Mill Creeks;* the low lands of *John Schoonmaker* were 8 or 10 acres, along the *Mill Creek;* and this possession he saw before *Josephat Dubois* died. He heard from the defendant's father, that the 80 and 100 acre deeds, covered the low lands of the family, south of the *Stoney Kill;* the fence of *John Schoonmaker* ran from the *Stoney* to the *Mill Creek;* he saw, when young, a brush fence, running part of the way down the *Mill Creek;* it had stakes and riders, and he saw it before the division of the *Grote Transport* tract. All the fences are now as when he saw them.

*Ephraim Baker,* aged 62 years, testified, that he lived with old *Jacobus Schoonmaker,* when a boy; that he then, or about that time, saw a fence, running from the low land to the *Mill Creek;* and that there is a fence there now: old *Jacobus Schoonmaker* went for rails, south of the *Mill Creek;* the low lands were cleared when the witness first knew them; the *Schoonmakers* used to cart

rails from south of the *Stoney Kill*, when he was a boy; the low lands of *John*, son of *Jacobus*, were all in fence and staked and ridered. His present memory did not enable him to say, that the fence went further south than the low land.

*Jacobus Wynkoop*, aged 71, and *Elias Miller*, aged 62 years, testified to the same effect. *Miller* said he saw, when young, a fence, which extended to the *Mill Creek*, and crossed it, and ran down the same some distance; it was on the land, then occupied by *John Schoonmaker;* this fence joined the fence said to belong to *Joakim;* beyond these fences, it was all commons. The low land was cleared, when he first saw it, and he was brought up within a mile and a half of it. He knew the division between *John* and *Joakim*, but does not know that it extended to the *Mill Creek;* the fences remained in the same places, until he moved away, in 1773. *John* used the land as his own; the upland was then all wood; the low lands only were cleared. It was an old clearing when he first saw it; the fences were sufficient to keep out cattle; and there were bars which opened through them.

The defendant then produced a *deed*, from the children of captain *Joakim* to *John Schoonmaker*, dated 20th *March*, 1745.

*Frederick Westbrook*, aged 54, a witness for the plaintiff, testified, that 40 years ago, no upland was cleared, and there was no fence on the *Mill Creek;* that 30 years ago he saw on the *Mill Creek*, a fence of lopped trees only, which appeared to have been recently made, and this possession fence ran up and down the *Creek*, for a short distance: *Lodowick Schoonmaker* told him, when he lived on the premises, 30 *years ago*, that he did not claim as far as the *Mill Creek*, but confined his claim to the fence running east and west.

*Abraham T. E. De Witt*, testified, that in 1793 he saw no fence on the *Mill Creek*, and only the rail fence, running east and west, not far south of the defendant's house.

*John Miller*, aged 64, another witness for the plaintiff, testified, that as to the existence of any fence, except that on the low land, that he had known the premises from a boy, and that there was no clearing on the low land, except five or six acres, at the old saw mill.

The defendant then read in evidence, the *patent of Rochester*, dated 25th *June*, 1703, and the records of *Rochester*, to prove that the grantors to *Leonard Cole*, were not trustees, at the time of the deed.

The judge charged the jury, that the title of the plaintiff was valid, and that he was entitled to recover, unless the defendant had made out an *adverse possession*, commencing in the life-time of *Josephat Dubois*, and continued down uninterruptedly ; that the *deed* to *John Schoonmaker* was not located, and so could not aid the defendant ; that there was not evidence of a continued possession, or of a sufficient fence ; that only the possession of the low land along the *Stoney Creek* appeared to be adverse ; and he thought the plaintiff ought to recover the land possessed by the defendant, to the foot of the ridge, along the low land.

The jury found a verdict for the plaintiff accordingly.

A motion was made to set aside the verdict, and for a new trial.

*L. Elmendorf*, for the defendant. The lessors have not shown sufficient title to enable them to recover against the defendant. They proved a conveyance from the trustees of *Rochester* to *Leonard Cole*, senior ; *Leonard Cole*, the younger, conveyed to *Josephat Dubois ;* but there is no evidence of any possession in *Dubois*, or those from whom he claimed title. No acts of ownership appear to have been exercised by either of them. On the other hand, the defendant has

shown an adverse possession as far back as the memory of the oldest witnesses can reach; a possession of above sixty years. Now, an adverse possession of 20 years is sufficient to give a good title.

Again, there is sufficient evidence of a *descent* cast. *John* the son of *Joakim Schoonmaker* died in possession, and was succeeded by his son, who continued in possession; and after his death, was succeeded by the defendant.

The deed from the children of captain *Joakim Schoonmaker*, in 1745, to *John Schoonmaker*, was sufficiently located to entitle the defendant to the benefit of a possession; and the judge was incorrect in directing the jury to disregard that deed.

The judge was also incorrect in his charge, in saying, that it was not enough merely to show a continued possession of 20 years, at a period of 40 years ago, but that an uninterrupted possession down to the present time should be shown, which would be a possession of 60 years. A continued adverse possession of 20 years gives a complete title; and there is no necessity for showing a continuation of the possession afterwards.

As the defendant held under colour of title, the lopping of trees round wood-land, connected with cultivated lands, is sufficient evidence of ownership, at least, 60 years ago; and no other evidence ought to be required.

*J. Tallmadge*, and *Sudam*, contra. The lessors have shown a regular paper title from the patent of *Rochester*. [*E. Williams*, for the defendant. We admit the paper title.] Then, have the lessors lost that title, for want of a possession? The possession of *John Schoonmaker* must enure to the benefit of the lessors, who have the

Jackson
v.
Schoonmaker.

*6 Cruise's Dig.
193, 194. 319,
320. 181. Com.
Rep. 233. Cro.
Jac. 75. Hob. 32.
Cro. Eliz. 15. 1
Vern. 22.

† 1 Burr. 107.
113. Leon. 209.
Bract. c. 2. fol.
160. Litt. s. 279.
1 Salk. 246. Cro.
Jac. 685. Co.
Litt. 153. b. 257.
b. 330. b. note.
285. 181. a. 66.
b. note. 207. 1
Cruise, 15. s. 45,
46. 5 Cruise, 214.
‡ 24 sess. c. 183.
s. 4.

§ 7 East, 319.
Co. Litt. 240. b.

¶ 2 Saund. 7.
n. 4. 1 Com. Rep.
72. 123. 3 Lev.
127. 1 Ld. Raym.
728. 1 Salk. 241.
6 Cruise, 144. s.
2. 145. s. 6.

title by deed; and unless the defendant makes out a clear adverse possession, the plaintiff must prevail. The lessors derive their title from government, which precludes the idea of a title in another. The possession will follow and support the title of the plaintiff, unless an actual *ouster* is shown.

The widow of *Josephat Dubois*, took a life estate under the will,* and after her death, as she remained a widow, the estate descended to the three daughters, named in the will.

But it is said, that there has been a disseisin and descent cast, sufficient to *toll* the right of entry. A *disseisin* is an actual entry by wrong on him who has the freehold, and turning him out. There must be a tortious *ouster*, an actual expulsion, to constitute a *disseisin*, as distinguished from an intrusion or dispossession.† There can be no disseisin by a person entering on vacant or uncultivated land; nor can there be a disseisin by a person who enters under colour of claim or title. The words of the 4th section of the statute of limitations,‡ show that the disseisor must have no right or title to the lands of which he dies seised, in order to toll the right of entry.

No disseisin can affect the right of a person not having a right of entry, at the time of the descent cast.§ During the life-time of the widow of the testator, the lessors had no right of entry. They cannot, therefore, be affected by any act, or *laches* of the tenant for life, or during the continuance of the particular estate.

Again, the lessors take the property as heirs at law, not as devisees; for where the same estate is devised to a person, which he would have taken by descent, he may take by descent.¶ Here the lessors may elect to take, either as heirs or devisees.

The statute of limitations would not run against the lessors, during the continuance of the life estate, and the

widow died in 1792; since that time the lessors have been *femes covert*, so that, since the death of *Josephat Dubois*, there has been no person who could bring an action of ejectment.

Though there may have been a possession adverse to the tenant for life, for more than 20 years, it will not bar those in remainder or reversion; for the statute does not begin to run against the remainder-man or reversioner, until he has a right of entry. So that an estate may have been held adversely during a hundred years, and yet be recovered by a remainder-man.* The lessors do not derive their title through the particular estate; their claim is wholly independent of the widow, and cannot be affected by any possession adverse to her.†

Again, to constitute such an adverse possession as will bar the real owner, it should not only be uninterrupted, but marked by definite boundaries.‡ There must be a real and substantial inclosure; an actual occupancy, definite, positive and notorious.§

The possession set up by the defendant, prior to the death of *J. Dubois*, is certainly not of this character, and the lessors are not to be affected by any subsequent acts. A mere possession, without colour of title, can never bar an adverse claim.¶

*E. Williams*, in reply. Whatever may have been the original right of the lessors, they have lost their remedy. *Joakim Schoonmaker*, the elder, was one of the original patentees; and in the year 1729, made his will, devising all his estate, then, as we contend, in his possession, to his children, who, in 1745, executed deeds of release to each other, for their respective shares. This deed recites, that the seven sons of *Joakim Schoonmaker*, the elder, made a partition of the greatest part of the real estate devised to them, on the 6th *April*, 1731, and had each of them, since that time, severally held and occupied their

* *Sug. Law Ven.* 239, 240. 1 *Burr.* 60. 2 *Salk.* 422. 1 *Lutw.* 779.

† 2 *Evans's Pothier*, 228. 1 *Pothier*, 456.

‡ 1 *Johns. Rep.* 158.

§ 2 *Johns. Rep.* 234.

¶ *Taylor's N. C. Rep.* 112.

shares, according to such division. By that division, the premises in question, among other lots, fell to *John Schoonmaker*.

The best evidence of a continued possession has been produced, that the nature of the case admits. Very aged witnesses prove a general reputation, and tradition as to the possession of *Joakim;* and an ancient deed refers to the same possession. The deed to *John* does, in fact, cover the premises in question; but whether it does or not, is immaterial. It is enough that he entered and took possession under the deed; thus entering under a colour or claim of right.

The judge charged the jury, that the nature of the possession of *John* was such, that it must enure to the benefit of the real owner, or, in other words, that it was a mere *possession fence.* But this name given to the inclosure, by some of the witnesses, ought not to mislead the court, so as to destroy the right of the defendant. It was such a fence as had been invariably used in the country, for inclosing land for agricultural purposes. It was not made of mere lopped trees, but was sufficient to keep out cattle. *John* cultivated the low land, built a house on the ridge, and inclosed the upland.

If there was an adverse possession in *Joakim*, and, afterwards, in *John*, antecedent to the year 1751, then *Cole* was incompetent to convey the premises to *Dubois.* But if there was not such an adverse possession against *Cole*, as to incapacitate him from conveying, still *Dubois* was dispossessed prior to 1751. If *Dubois* was out of possession, he could not devise in 1757; and then his children must take as heirs, and not as devisees. If they claim as *heirs*, what becomes of the particular estate in the wife, for life, on which so much of the argument of the plaintiff's counsel is founded? It is said, the lessors were *femes covert;* but if they took as *heirs*, they must take in 1757, and were bound to bring their action in twenty

years, thereafter. The husband and wife might bring their action. The saving of the statute is only for ten years, after the disability is removed. The right of the husband and wife to bring the action is barred ; and this is an ejectment on the demise of the husband and wife.

Again, if a disseisor having been in the peaceable possession of land for five years, dies, a descent is cast, and *tolls* the right of entry, even of a *feme covert.* A *feme covert* may be disseised.* In the case of *Van Dyck* v. *Van Beuren* and *Vosburgh,*† the court decided that there might be a disseisin of vacant land ; and that an exclusive perception of the rents and profits would work a disseisin, in spite of the true owner.

* 1 *Lev.* 166.

† 1 *Caines,* 24. *S. C.* 1 *Johns. Rep.* 345.

It is said, that as the title comes from government, it excludes the idea of a title in another ; and the possession of the defendant, or those under whom he claims, must enure to the benefit of the true owner. But all grants of lands are derived from the government, and if this argument is to prevail, there would be no occasion for a statute of limitations. But that statute is founded on the presumption, that after twenty years, all evidence of the title is lost ; and after a possession for that period, the court will presume a title in the possessor. A grant is presumed after thirty years.

KENT, Ch. J. delivered the opinion of the court. In this case, a regular paper title to the premises was shown to reside in those lessors of the plaintiff, who are daughters of *Josephat Dubois.* He died in the year 1757, and by his will, an estate was given to his widow, for life, provided she remained his widow, (as she did,) and after her death, the remainder in fee to his daughters.

1. The first, and, indeed, the only material question of law arising upon the case is, whether the lessors are not barred by the statute of limitations. Assuming it as a

fact, that *Dubois* was not disseised, and that no adverse possession existed against him, in his life-time, of the premises recovered, which are the uplands of *Stoney Kill*, it is then a settled position, that no subsequent disseisin or adverse possession, would bar the right of the lessors, if they brought their suit (as it appears they did) within 20 years after the death of the widow. Neither a descent cast, nor the statute of limitations will affect a right, if a particular estate existed at the time of the disseisin, or when the adverse possession began, because a right of entry in the remainder-man cannot exist, during the existence of the particular estate; and the *laches* of a tenant for life will not affect the party entitled. An entry to avoid the statute, must be an entry for the purpose of taking possession, and such an entry cannot be made during the existence of the life estate. (*Hunt* v. *Bourne*, 1 *Lutw.* 779. 781, 782. 2 *Salk.* 422. 1 *Burr.* 120. 126. 7 *East*, 311, 312. 319. 321.) .

2. The second material point made in the cause is, as to a disseisin or adverse possession, existing at the time of the death of *Dubois*. On this point, the testimony is contradictory, and must be very uncertain, from the great length of time which has elapsed since the death of *Dubois*, which was 51 years before the time of the trial. Five witnesses on the part of the defendant, testified to facts in favour of the existence of such adverse possession, though none of the facts tended to establish a disseisin, in the strictly technical sense of the term. Four witnesses on the part of the plaintiff, testified to facts contradicting the existence of any such possession. Considering the remoteness of the period to which the witnesses referred, the loose and uncertain tenor and manner of their testimony, the ambiguous nature of the possession set up, the contradictory and nearly balanced testimony upon the subject, and that the cause was tried

by a struck jury, eight of whom had a view of the premises, there is no probability that any new light can be thrown upon the subject. The court would have been as well, if not better satisfied, if the verdict had been the other way; but under the circumstances of the case, they do not think it would consist with the exercise of a sound discretion, to disturb the verdict.

Motion denied.