Catron, J.
delivered the opinion of the Court. This was an action of ejectment brought to the Circuit Court of Williamson County, at the May term, in the year 1816 ; at the February term, 1821, the cause was tried, when the jury gave a special verdict, containing the following facts : “That on the 10th July, 1784, John Elliott made an entry for the land in controversy ; that the said John Elliott was killed by the Indians on the 20th May, 1789 ; that he died intestate, leaving Zilpha Elliott his widow, and George S. Elliott his son and only heir; that George S. Elliott was born on the 14th February, 1788 ; that at the April term of Tennessee County Court for the year 1791, Zilpha Elliott, widow of said John Elliott, deceased, and mother of George S. Elliot, was appointed by said [397] Court guardian for George S. Elliot, in which county she then lived with her son, and in which county John Elliott lived at the time of his death; that she gave bond and security, as by law required, and entered on the guardianship ; that in the year 1792 she intermarried with one James M’Carrol; and that she died in the year 1812.” The jury then found that the proceedings set forth in record, marked A and made a part of their special verdict, took place in' the order in which they are therein set forth. This record shows that a writ of trespass on the case issued 13th January, 1791, returnable to the April term of the County Court of Tennessee, 1791, at the instance of James Elliott, sen. against George Oldham and David Johnson, administrators of John Elliott, deceased. Damage $ 300. At the same term the-defendants appeared and pleaded “plene administravit; no affidavit required.” At July term, same year, is the following verdict: "Jury No. 5 sworn, say they find for the plaintiff damages £103 16s.” The record then proceeds thus : “ Whereupon a writ of fieri facias issued in the following words, to wit: this writ commands the sheriff of Tennessee County, that of the goods and chattels, lands and tenements, of John Elliott, deceased, he cause to be made the sum of £ 103 for a debt that James Elliott lately recovered against him in Tennessee County Court, also £ 3 18s. lid. for his expenses and costs in said suit, whereof the said John Elliott is convicted,” &e. Upon which execution is the following return: “ Came to hand the 27th September; nothing found. James Boyd.” Afterwards, on the 9th of March, 1792, another execution issued from the same Court, to the same sheriff, in behalf of the same person, commanding him that of the goods and chattels, lands and tenements, of John Elliott, deceased, he cause to be made £4 2s. 8d. for expenses and costs, which James Elliott lately recovered in Tennessee County Court, of which John Elliott is convicted, &c. On which execution is the return of “ came to hand 9 th March, 1792 ; nothing found. G. Briscoe.” The record then states that at .&pril term, 1792, it was ordered that George Neville, Esq. be appointed guardian to George Sims Elliott, for the special purpose of receiving service of two [398] writs of scire facias, — one at the instance of James Elliott against *683 the said George S. Elliott, as heir at law of John Elliott, deceased, to show cause, if any he has, why execution should not be had of the real estate of the deceased in his hands ; the other at the instance of Robert Nelson, Esq. against the said George S. Elliott for the like purpose; and that he be vested with full power to defend the same, in behalf of the said George S. Elliott, heir at law, &c.; and thereupon (the record says) a writ of scire facias issued in the following words, to wit: “ Whereas James Elliott, in the Court of Pleas and Quarter Sessions for the county of Tennessee, lately recovered a judgment against John Elliott, deceased, for £ 103 16s. and costs, as appears of record, and you are commanded to cause to be made known to George Neville, Esq., guardian of George S. Elliott, heir of John Elliott, to be and appear before our Court, July term, 1792, to show cause why execution should not be levied of the real estate of the said deceased, in his hands ” : issued the 9th June, 1792 : indorsed, “ made known to George Neville, Esq., on the 9th June, 1792, in presence of Anthony Crutcher and Christopher Owinsley. G. Briscoe.” At the return term of this scire facias is the following entry: “ Judgment according to sci. fa.” And at October term, 1793, an order was made in the following words, to wit: “ Ordered, that execution issue against the real estate of John Elliott, deceased, to satisfy the remaining part of the judgment, James Elliott against John Elliott, deceased, heir, and also Robert Nelson against John Elliott, deceased. Whereupon, and from which term, issued a writ of fieri facias to the sheriff of Davidson County, commanding the sheriff that of the lands and tenements of John Elliott, deceased, he cause to be made the sum of £ 77 16s., being the balance due on a judgment obtained by James Elliott against the said Elliott’s administrators, in Tennessee County Court; also the sum of £ 4 12s. lid, costs of suit in that behalf expended. Issued 20th November, 1793 ; indorsed, “ Came to hand. 10th December, 1793. Levied, at the instance of the plaintiff’s attorney, on one 640-acre tract, lying in the county [399] of Davidson, on Big Harpeth River; and sold the same to Mr. M’Carrol for the sum of ten pounds, this 18th January, 1794. N. P. Hardiman.” The jury then find the deed from N. P. Iiardiman to James M’Carrol was made at the time it purported to have been made, as the sheriff of Davidson County. It is in the usual form of sheriff’s deeds, referring to the execution as his authority and reciting the substance of it, and says it was made the 6th of April, 1804, by said Nicholas as aforesaid, for and in consideration of the sum of ten pounds to him in hand paid by James M’Carrol, he then bargains, sells, aliens, enfeoffs, conveys, and confirms unto the said James M’Carrol, his heirs and assigns forever, the aforesaid tract of land, as fully, to all intents and purposes, as the power of the said Nicholas, sheriff as aforesaid, will authorize the said tract of land to be conveyed, situated, &c. To have and to hold, to the said James M’Car-rol, his heirs and assigns forever, as fully as the power in the said Nicholas *684 will authorize, and no further; and which deed was duly acknowledged and registered. The jury then find that, after the death of John Elliott, to wit, on the 27th April, 1793, a grant issued to the heirs of John Elliott for the lands in controversy, marked and made a part of their special verdict. The grant says, we have given to the heirs of John Elliott, assignee, &c. To hold, to the said heirs, their heirs and assigns forever. The jury further find that, in February or March, 1804, James M’Carrol entered and took possession of the 640-acre tract, and continued such possession regularly until the year 1812 ; and on the 11th day of April, 1804, sold the land in controversy to James Gray, being 227 acres of the 640-acre tract, as per deed to said Gray, marked C D and made part of the special verdict. This deed witnesseth, that for the consideration of $ 2,000, to me in hand paid, I, the said James M’Carrol, have this day .bargained, sold, and confirmed, and by these presents do bargain, sell, and confirm, unto the said James Gray, his heirs forever, &c. To have and to hold the aforesaid premises, with the appurtenances, to the only proper use, benefit, and behoof of James Gray, his heirs and assigns forever; and containing a clause • of [400] general warranty. James Gray, immediately after the date of this deed, entered on the land and has continued the possession from that time down to the commencement of this suit; and no part of the 227 acres deeded by M’Carrol ever was in the actual possession of said M’Carrol. The jury further find that Geo. S. Elliott sold and deeded the land in controversy to Patrick Darby, the lessor of the plaintiff, on the 22d day of January, in the year 1816; that all the said deeds were regularly proven and registered. The grant and deed to Gray, and deed from Elliott to Darby, covers the land in dispute. The jury further say, they are unadvised what the law is upon the above facts, and submit the same to the Court for their judgment; and if the law be with the plaintiff", judgment is to be entered that he recover his term, &c.; but if the law is with the defendant, that then judgment be rendered for the defendant. On this special verdict the Circuit Court rendered judgment for the plaintiff, from which the defendant prayed an appeal in the nature of a writ of error, to this Court.
The only error specially assigned is, that the defendant had a good title to protect him, under the Act of 1797, ch. 43, § 4. General errors are also assigned. Gray, the defendant, got his deed, and took possession, by virtue thereof, in April, 1804. George S. Elliott came of age 14th February, 1809.
Upon this statement of facts various questions have been made at the bar. First, the-counsel for the plaintiffs in error contend, that the judgment rendered against the estate of George S. Elliott, which descended to him from his father, is a binding and valid judgment, and substantially pursues the Act of 1784, ch. 11. That act provides, that if an administrator is sued, and pleads fully administered, or not sufficient assets to satisfy the *685 plaintiff’s demand, and the plea is found in the administrator’s favor, the plaintiff may proceed to ascertain his demand, and sign judgment; but before taking out execution of the real estate of the deceased debtor, writs of scire facias shall issue, calling upon the heirs or devisees to show cause to the contrary. By the common law, in all actions ancestriel, the parol demurred [401] until the coming of age of the heir; nor could the lands descended be made liable to discharge the simple contract debts of the ancestor, by any process in a court of law. This Statute has changed the common law (regulated by English statutes), and made lands descended liable, in the tenderest infancy of the heir, without the privilege of demurring during his infancy; and it has also made the lands liable for every claim that can be set up against the administrator of the ancestor. The Statute then, being derogatory to the common law, must be strictly construed. So it was construed in the case of Stephenson v. Yandle, 3 Hay. 117; in Roberts v. Busby and Wife, 3 Hay. 303. It has been the policy of this State, and it is believed of every one in the Union, to exhaust the personal property before the real estate of the ancestor is affected; and until this fact is ascertained by the statutory mode, the courts of law have no jurisdiction to proceed against the realty in the hands of the heir. The Statute of 1784 requires that this shall be found by the verdict of a jury upon the issue of fully or not fully administered. In the above cause of James Elliott against John Elliott’s administrators, there is a general finding for the plaintiff, to wit: “ Plene adminisiravit, — jury No. 5 sworn, say they find for the plaintiff damages £103 16s.” ; what was the issue here? I have fully administered, say the administrators; you have not fully administered, says the plaintiff; we, of the jury, find the replication (that you have not fully administered) true, is the response of the verdict. Where is the finding that shows the personal estate of Jno. Elliott exhausted? Surely not in this record; but the very reverse is shown; and this fact not appearing, the County Court of Tennessee had no jurisdiction of the lands descended over the heir, as such, or power to give judgment on the sci.fa.; and which judgment is void, and can be taken advantage of collaterally in'the action of ejectment. -The judgment being void, it consequently follows that the execution thereon, the sale by the sheriff of Davidson County, and the deed made by him to M’Carrol for the land in controversy, are also void. Therefore M’Carrol, by his deed of 1804 to [402] Gray, the defendant, communicated no title to the latter. This defendant stands precisely upon the same footing with a purchaser at a void tax sale; or one getting a deed from another having no title whatever. The plaintiff is therefore clearly entitled to recover, unless the defendant can resist his claim by his length of possession. And this necessarily brings into view the much agitated question of the Act of Limitations. And here I will remark, that I would merely concur with the opinion ctf *686 Judge Haywood, in the case of Barton’s Lessee v. Shall, were it not that the counsel of the defendant in error, with much earnestness and propriety, have requested that this question should be eo'nsidered of, by the judges lately appointed, and written opinions thereon given.
And forasmuch as I have always thought that the Legislature, in the words, “Deed of conveyance founded upon a grant,” used in the Statute, referred rather to the grant of land occupied, than to the patent evidencing the title, I will give my reasons for so thinking.
It must be remembered that the people of this country, until the termination of the Indian war in 1795, were almost insulated from the balance of the world ; and that the great object of interest was the landed property of the country; with the locality of which, and the face of the country generally, the early settlers and surveyors here had a minute and accurate knowledge, almost surpassing belief. They were men of strong, ardent, and active minds; but a great majority of them hardy woodsmen, and almost illiterate. It was therefore not strange that they should adopt a language in reference to the objects around them, somewhat peculiar, and by a single phrase convey to each other a compound idea; which, among people of more literature, did not express so much. This was obviously the case with the old settlers when they spoke of a “grant” or “ entry ”; /or instance, when they spoke of “ a 640-acre grant,” or varied the words and said, “ a grant for 640 acres,” they did not mean, as legal men of other countries did, a paper purporting to be a patent, from the State of North Carolina for 640 acres of land, but they meant the very [408] land itself, compounded with the idea that it had been granted by patent. “ A 640-acre grant” was universally (it is believed) accepted to mean a .specific tract of patented land, for this quantity; and in which conception of the mind the paper by which the land was granted but remotely and slightly formed an incident. The figure of the land, its surface, and the objects upon it combined, presenting themselves to the mind when was used the word “ a grant,” and the same may be said of entries. Out of men deriving their ideas principally from the soil, and the objects in nature around them, and using a language to express those ideas almost peculiar to themselves, was the Legislature of 1797 composed; and by whom the Act of 1797, ch. 43, § 4, was passed. Judge Overton, in his very able opinion in the cause of Weatherhead and Douglass v. The Lessee of Bledsoe’s Heirs, 2 Tenn. Rep. 371, tells us, that just before the meeting of the Assembly of ’97, the cause of Kerr v. Porter, reported in 1st Tenn. Rep. was much discussed in the old Superior Court at Nashville, and produced great excitement in the country. The doctrine in that case contended for, being that seven years’ possession under the Act of 1715 would give a good title against the State or an individual. A doctrine which was thought iniquitous and unjust. Not the least doubt can be entertained of the correctness *687 of these representations. Judge Overton, of all men now living, has the best right to know the rise and progress of this question ; because he is the oldest practising lawyer in the State, and has had greatly to do therewith. And although it is said, in some of the opinions upon this subject, that no apprehension could possibly have been entertained, that a seven years’ possession could bar the State, under the Act of 1715, because acts of limitation do not run against the government; yet that such were the apprehensions of the warrant-holders and others, there is no doubt. The doctrine had not found its way to this country, it should seem, in 1796, when Kerr and Porter was argued, that the State was not a “ person ” meant in the Act, and therefore not affected; at least it was not generally understood. Porter attempted to defend [404] himself under an entry with seven years’ possession, against a grant; had this been permitted, he could, after he resisted the title of Kerr successfully, have -withdrawn his entry, lived upon Kerr’s grant, and procured as much more land with his raised warrant. This%as esteemed iniquitous and unjust, ás well it might be. And to obviate all doubt upon the subject, the Legislature enacts, “ that in all cases where any person or persons shall have had seven years’ peaceable possession of any land, by virtue of a grant or deed of conveyance founded upon a grant, and no legal claim by suit in law, by such set up to said land, within the above-said term, that then, and in that case, the person or persons so holding possession as aforesaid, shall be entitled to hold possession, in preference to all claimants, of such quantity of land as shall be specified in his, her, or their said grant, or deed of conveyance founded on a grant, as aforesaid; and any person or persons who shall neglect for the said term of seven years from the time of such peaceable possession having been obtained, to avail themselves of any title or legal claim which he, she, or they have to any lands within this State, shall, and is hereby declared to be forever barred.” Let us examine the first clause of this Statute, “ shall have had possession by virtue of a grant,” meaning that the possessor should not be a naked trespasser upon the land of the State, or individuals; and if he had the youngest grant for the land he was in possession of, he should hold it, if in for seven years without suit being brought against him.
Or, shall- have had seven years’ peaceable possession of any land, by virtue of a deed of conveyance founded upon a grant. The words “ founded ” and “ grant ” have been productive of the great difficulties in the construction of this Statute. What is the meaning of the word “ founded ” ? It means, to lay the basis of a building, or the like ; to fix firm; and is the verb to a deed of conveyance. Then the deed must be founded and fixed- — upon what? A grant of land, and not a grant of paper. A deed means a paper purporting to convey a fee-simple estate to the occupier, made by some person having or pretending to have title *688 to the premises [405] conveyed; and this deed must be founded upon the grant; that is, it must be fixed upon it by marked lines and boundaries, and the defendant must have had seven years’ possession, holding for himself under it, without suit being brought against him for the land ; and then he will have a good title against the world; for the Statute bars all others, unless they are within its exception. He need only have possession by virtue of a grant, or a deed of conveyance marked out upon a grant of land; he need not have possession by both a deed and grant; the Statute only requires the one or the other. Yet those decisions that require a connected chain of title go upon the ground that the possessor must be in, by virtue of every mesne conveyance from the grant up ; and the grant also, or the deed is not founded upon the grant. It may be said the above construction does not conform to the philosophy of language, and somewhat violates grammatical rules: this is very truebut the Statute itself violates propriety of language in using the word ‘‘ founded,” and grammatical construction notoriously in several sentences. The phrase “ founded upon a grant,” must mean what is above attributed to it, or it means nothing: To prove this, let us examine the contrary construction and see what it results in. And here let us lay down the principles upon which the counsel of the defendant in error claim the decision of the Court in their favor. First, they contend that in the case of Lillard and Others v. Elliott and Others, decided at August term, 1815, at Nashville, by Judge Cook, who confirmed the opinion of the circuit judge (there being only two judges then upon the ■bench of the Supreme Court), the principle was decided that there must be a chain of connected title, from the possessor up to the grantee. The facts in that case are these: the land was granted to John Elliott in 1790 ; another John Elliott removed from North Carolina to this State before the issuance'of the grant, and died. The heirs of this John Elliott got possession of the patent, and conveyed to Motherall in 1793, who took possession in 1803, and held more than seven years, and until the commencement of the suit. The action was brought by the heirs of [406] the grantee, and the Statute relied upon as a bar. Judge Overton and Judge Cook differed in opinion. The advocates of the opinion of Judge Cook have at all times conceded that only two cases could occur, as they believed, upon which the Statute would operate, to wit: in favor of a possessor under a younger grant, and in favor of one under a deed from a grantee who had previously conveyed; and even this was thought by them doubtful: for Judge Cook says, “ a deed cannot be founded upon a grant, which will not support it for want of a regular chain of conveyances, or that will force it in equity.” This principle was further confirmed by the case of Weather-head and Douglass v. The Lessee of Bledsoe’s Heirs, decided December term, 1815, at Carthage, there then being upon the bench' Judges Overton, Cook, and Koane; the latter having been appointed by act of Assembly *689 since the decision in Lillard and Elliott. The land was granted to Anthony Bledsoe ; Douglass got judgment against Bowman, took out execution, had it levied upon the land of Bledsoe, and the same sold, and became the purchaser. He sold and conveyed to Lyon in 1800, who sold and conveyed to "Weatherliead at the same time, who took possession and held until 1811, under the deed from Lyon, when he was sued by Bledsoe’s heirs. Judge Overton decided that the defendant, "Weatherhead, was protected by the Statute; but Judge Cook was of the opinion that there was no connection between the deed and grant, and that therefore the former opinion given by him must be confirmed. 2 Tenn. Rep. 381. Judge Roane substantially concurred with Judge Cook, and the decision of the Circuit Court was affirmed, which was for the lessors of the plaintiff. In February, 1816, the cause of Patton’s Lessee v. Easton, came on before the Supreme Court of the United States; in which case there was a link in the chain of title wanting; and the Court says, “ two cases have been decided in the Supreme Court of the State of Tennessee, which have settled the construction of the Act of 1797. It has been decided that a possession of seven years is a bar only when held under a grant or deed of conveyance founded upon a grant; the deed must be' connected with the [-407] grant. This Court concurs in the opinion. A deed cannot be founded upon a grant, which gives a title not derived, in law or equity, from the grant, and the words ‘ founded on a grant,’ are too important to be discarded.”
Judge Cook, in his opinion in Weatherhead and Douglass v. Bledsoe’s Heirs, says: “ Whether, if there is but one grant, the claimant under a second deed from the same grantee, who has been in possession seven years, can avail himself of the Statute, I will not take upon me now to decide, as no such case is now before the Court.” 2 Tenn. Rep. 383. These cases establish the principle that there must be a connéction by deeds with the grant, or the wanting link supplied by an effective equity. According to this principle, supposing the above land .had been sold and conveyed by John Elliott to A, and then John Elliott had conveyed to Motherall, who had lived seven years upon the land, under the second deed; would Motherall’s deed, in this case, have been connected with the grant ? And could he have defended himself successfully against a suit by A ? He has the deed from Elliott to A before him, upon the records of the country, is compelled to take notice of it, and cannot say he was defrauded without his knowledge, as Motherall well might, in the above causes. What more right had Elliott to make the second conveyance to Motherall, than any other stranger to the land ? He had parted with all his title to A, which was a matter of record, and the second deed was as void and as fraudulent as that of any third person could be. The case put, and that of Lillard and Elliott, upon principle and justice, are parallel. . There is a link wanting in each case; and therefore, one holding under the second deed could *690 not be protected by the above decisions; and so by many, at tbe time, was thought to be the effect of the decision. Afterwards, about 1816, a suit was brought by Woods and Osborn v. Robert Howard, for 1,000 acres of land, lying in White County. The facts were these: 2,500 acres of land were granted to Robert King in 1797 ; in 1803 he sold and conveyed 1,000 acres out of the tract to Woods and Osborn, made them a deed, which was registered in Eoane [408] County shortly after made, — the land lying in the Indian boundary. In 1802 John and James M’Guffin had recovered a judgment against Robert King in the Superior Court at Knoxville, on which various executions had issued; and in 1807 one issued to White County, which was levied upon the whole 2,500-acre tract, including the 1,000 acres of Woods and Osborn. The land was sold by the sheriff and bought in by Howard, and the sheriff conveyed, by metes and bounds, the 2,500 acres. Howard took possession of the part deeded to Woods and Osborn, and held it more than seven years, when he was sued by them. He relied upon the Statute, and the Circuit Court decided in his favor. The lessors of the plaintiff took up the cause to the Supreme Court at Sparta, where, in December, 1819, or June, 1820, it was argued before Judges Haywood, Whyte, and Emmerson, and the decision of the Circuit Court confirmed unanimously; the Court saying that this was clearly a case within the operation of the Statute. With this decision the parties rested satisfied; and it is believed it is almost the only one made since 1815 that is not remaining in litigation. Yet this cause was decided notoriously wrong, according to the principle above laid down. What more right had the sheriff to seize upon and sell the lands o^ Woods and Osborn, by virtue of an execution against Robert King, than the sheriff of Sumner had to sell the lands of Bledsoe’s heirs upon an execution against Bowman ? Hardly a shade óf difference can be perceived between the cases. The execution gave the sheriff no authority to sell and make a deed to Howard; for it commanded him that of the goods and chattels, lands and tenements, of Robert King, he make the money. He was, then, a mere third person, conveying without authority; and where is the connection between the deed and the grant ? Yet, notwithstanding the above cause, the principle laid down in Lillard and Elliott has been extended; and in the cause of Barton’s Lessee v. Foster, upon a void tax sale, where the defendant had seven years’ possession, Judges Whyte and Emmerson decided that the Statute did not protect the defendant, because the sheriff had no power to make the sale, and in making [409] the deed was a mere third person, and therefore there was no connection. But a much broader ground is still contended for by the counsel for the defendant in error, as having been recognized in the case of Darby’s Lessee v. M’Carrol, Pollard, and Reasons, reported in 5th Haywood, 286, where is the opinion of Judge Haywood. But Judges Whyte and Emmerson, at a subsequent term, decided *691 differently, and said the defendants were not protected by the Statute. The facts in the cause are briefly these: Neville was appointed special guardian to G. S. Elliott, to defend the suits mentioned in the present cause; and the executions not being satisfied by sales of property, application was made by him to the County Court, to authorize him to sell so much of the infant’s land as would pay the debt, which was ordered, and the land sold to M’Carrol, the step-father, who sold and conveyed to Pollard and Reasons in 1793 ; and who took possession and continued it up to 1816, when they were sued. It was decided that the sale by Neville to M’Carrol was void, there being a regular guardian, and therefore the County Court had no power to make such an order. That case in principle is precisely the present. The principle there laid down, as they contend, is (and so it is understood by me), that the deed made to M’Carrol by Neville was a fraudulent and void deed; and that a void deed is no deed. And M’Car-rol having no deed to protect himself under, was not entitled to the benefit of the Act of 1797, and precisely in the same situation of a trespasser, without any title. Judge Whyte says: “ I have no hesitation in saying that the deed of M’Carrol is not a deed under the Act of 1797, ch. 43, § 4; that'his possession is a possession without deed, and of course'inoperative to bar the possession of the true owner.” The opinion then further decides that Pollard and Reasons being purchasers with notice of all the facts and circumstances, to which their title must necessarily have led them, their deeds are utterly void with M’Carrol’s ; and being without deeds, they have no title upon which the Act of 1797 can operate. It it believed that thus stood the question on Judge Emmerson’s leaving the bench, where the title was, in its nature legal.
[410] Immediately upon the case of Lillard and Elliott being decided, it was strongly objected against the decision that but two possible cases could be presented upon which the Statute would operate, to wit: the case of a younger grantee, and the possessor under a second deed from the grantee. Even this latter was treated as doubtful; and a few months after-wards the opinion was explained in the case of Weatherhead and Douglass; where it is said there must be a connected chain of legal paper title, or an equity that would force a decree. 2 Tenn. Rep. 383. Undoubtedly this opinion contemplates an equity, good in itself. Why should the defendant submit his cause for hearing, without a bill or answer, to a jury ? The appropriate tribunal, a court of equity, would more certainly have afforded him the relief desired. Therefore the Statute would have been a dead letter, so far as the defendant was concerned.
It soon became manifest that the Statute was a mere encumbrance to a defendant who held the equitable title to the land, and that the construction contended for, in reference to equities, resulted in nothing. Therefore, to give the Statute some reasonable scope, the idea of “ apparent equitable *692 connection,” being sufficient to satisfy the same, is introduced in the case of Harris and Holmes. Peck’s Rep. 234. It is believed the question, what is an “ apparent equity ” ? would produce more difficulty than the doubtful words in the Statute have done. Notwithstanding the highly respectable authorities that seem to be of a different opinion, I cannot but believe that the Act of Limitations was intended to vest in the possessor for seven years, by virtue of a deed for granted land, a title in its nature purely legal; and that his defence must rest upon such legal title only. That a complicated cause in equity should be tried by a jury (where there should be a real equity), in the action of ejectment, was, it is thought, not within the contemplation of the Legislature, which passed the Act of 1797. Nor is it supposed that the framers of that Act conceived that a seven years’ possessor could defend himself upon “ an apparent equity ”; that is, upon a set of seemly circumstances, amounting, in law, to nothing; which, to say the least of it, is a defence entirely new.
[411] Equitable, or apparent equitable titles could not have been meant, for other reasons. All acts of limitation proceed upon presumption, which is to supply the place of proof, after the time limited by the Statute. Yet this principle is flagrantly violated by compelling the defendant to connect himself by an equitable title, or facts that look like an equity in the defendant, to the land in dispute ; for these facts he must prove. And if he fails the presumption is against him, to wit: that they do not exist. Therefore, the presumption is daily strengthening on the side of the claimant, and the title of the possessor growing weaker. For instance, A, the grantee, sells to B and conveys ; but the deed is destroyed by fire before registered. A dies, and no other deed can be had. B sells to C and many others, parcels of the land, who transfer to others again, until the land passes through a hundred hands, by regular conveyances. All this time the heir stands by and acquiesces. The lost deed is never thought of until thirty years roll round, when the feoffor and the witnesses are dead, and every trace of proof of the deed (hearsay aside) has perished. The land has become of immense value ; the heir turns knave, sells out, and the purchaser sues ; for the heir, pretty generally, has some respect for the memory of his ancestor; whereas the speculator has none. Where is the presumption in this case that would protect those in possession ? They, from necessity, are driven to their proof of the execution of the lost deed, which, twenty years earlier, would have given them no trouble; but now that they are unable to make the proof, the 'presumption that they never had any deed holds against them, and they are turned out of possession. Or, supposing A, the grantee, in 1784, sold to B a tract of land or a town lot for a rifle or a few skins, then the full value, and gives B a memorandum upon paper evidencing the contract ; B sells to C, and indorses the paper in blank, which is passed through twenty hands, and the twentieth owner takes possession and loses *693 the paper, or it is worn out; he lives upon the property twenty years, and then sells out for five hundred times as much as he gave; the property keeps increasing in value, [412] and in 1850 it is worth $ 100,000, and has been divided and passed through twenty hands by regular deeds ; every knowledge of the paper connecting the conveyances with the grant is gone, and then the heir of the grantee, perhaps a great-grandchild, comes and brings suit for the lot or land. Where is the presumption ? Why, in favor of the lessor of the plaintiff, and against the defendant. For, unless the defendant proves the existence of his equity, the court presumes that he has none. Proof is required and presumption not taken on behalf of the defendant.
The purchasers of entries and occupant claims, where the grant has issued to the enterer or occupant, and where there has been no writing, are in a worse situation than any class of claimants yet mentioned; for in twenty years more, the heirs of the large warrant-holders, were they so disposed, could find abundance of titles and improved lands, which they might recover ; because, by time, all traces of the equity of the true owner were swept away, and presumption that they were the true owners stood in favor of their legal title.
The cause of Barton’s Lessee v. Shall strikingly illustrated the unsoundness of the doctrine here examined ; a true statement of the facts in which is given by Judge Haywood in his opinion, Peck’s Rep. 215. Stephen Barton sued for the lot in 1818. His father, Samuel Barton, had sold it to Sappington in 1803. In 1806 he conveyed to Jenkin Whiteside, who, in the same year, conveyed to Dr. Dickson. In 1808 Samuel Barton conveyed to Sappington, who before that time had an agreement only. Possession was taken and holden from 1803, first .by Sappington, then White-side, then Dickson, and then Shall, all under deeds. In 1790, at a lottery for choice of lots in Nashville, at $ 10 each, the lot was drawn and paid for, as the defendant alleged, by Samuel Barton, who was largely indebted to John Buchanan, and caused the lot to be conveyed to his son Stephen, then about eighteen months old, The questions were, 1st. Did Samuel Barton draw the lot? 2d. Did he pay for the lot ? 3d. Was the conveyance made to defraud John Buchanan ? Numerous witnesses attended [413] to prove the first and second points, and a much greater number to prove the third. From facts and circumstances the last point was pretty well supported ; but the first two, from a lapse of more than thirty years, could not be proven but from hearsay, which was by the Court very properly rejected. And after a trial of fifteen days, the jury, for want of proof, of the second point particularly, found for the plaintiff. Had this cause been brought a few years sooner, while Rice, the treasurer of the town commissioners, was yet alive, the plaintiff could not possibly have recovered. The record presented to the Supreme Court, in 1823, the ruinous consequences this doctrine would lead to, and a majority of the judges changed it.
*694 The defendant, in such cases, cannot stand upon the presumption arising in his favor upon possession, because he is made a complainant in equity. The lessor of the plaintiff introduces his grant, proves the defendant in possession of the premises, and rests his cause.
The defendant introduces his deed, and then brings his cause in equity to show the connection before the jury as a complainant, and is answered by the plaintiff in ejectment, “I deny your equity; my having the legal title raises this presumption against you; therefore, prove your equitable title.” Decisions of courts should be fresh and in their vigor when the marble slabs that mark the ashes of the judges who made them are effaced and in ruins. Yet this doctrine cannot so endure; for where is the possessor who could prove his equitable connection, resting upon the memory of man, a century after the facts necessary to be proven transpired ? Or, supposing the register’s office in Greene County, or in Davidson County, was burnt; in either of which offices are registered deeds to the amount of perhaps half a million of acres of land, lying in various parts of the State, and the original deeds, in a great majority of instances, lost. The lands contained in a single large deed, perhaps, have passed through five hundred or a thousand hands, within the last thirty or forty years ; and they continue to change owners for a century after the burning, when the heir of him who made the deed (the [414] record of which is destroyed) by tombstones, family Bibles, and ancient people, traces his heirship, and brings suit for the land, then worth millions. Who is to prove the existence of the destroyed deed ? And, say these decisions to the defendant, before you presume, you must make proof to rest your presumption upon ; for, without proof, the legal title and presumption are against you.
In the Old World, down through the Dark and Middle Ages, in the midst of baronial violence and monkish rapacity; and in England, whose laws we have adopted for more than a thousand years, do we see the care of the government, with peculiar earnestness, bestowed upon the cultivators of the soil. The protection of possessors of the soil was the life and soul of the feudal system. The permanency of the feudal tenantry was as necessary to the lord of the soil and to the head of the government, as are the cords to a cable, without which the vessel of state was totally unmanageable. And therefore, policy extended presumption in favor of possessors a great way. As the feudal system wore away there were statutes passed limiting the time within which one in possession might be sued. In England, twenty years was the limited time, by the 21 Jac. 1, ch. 16. This Statute has been, with slight alterations, adopted in most of the old States of this Union; and the Act of 1715, ch. 27, of North Carolina, is the same in substance as the 21 of James. These statutes, and some preceding ones, limiting the time to sixty years, were all borrowed from the feudal laws, and only altered it so far as to fix a time certain when the presumption of a *695 good title, and the loss of all evidence thereof, should stand in favor of the possessor; and one in by a naked possession is protected by these statutes to the extent of his actual possession, except in North Carolina, where different decisions have been made. The Act of 1797 only professes to explain the Act of 1715, and is a part thereof.
It was thought reasonable that the occupier should have possession by virtue of a legal title-paper, which, upon the records of the country, would point out to third persons the limits to which the possession extended.
[415] This course of decision, then, cuts off, in effect, all presumption in favor of the peaceable possessor, is directly contrary to the principles of the common law, contrary to the principles of the Statute of 1715, upon which it is founded, and contrary to what has been deemed good policy in all well-regulated governments. I am therefore constrained to conclude, .notwithstanding the very learned and able opinions to the contrary, that the framers of the Act of 1797 never contemplated the introduction of equitable, or apparent equitable title, for the purpose of forming a connection : and that the doctrine must, in half a century, defeat itself; when the opinions that have adopted it will of course fall with it. A rule for the regulation of 'titles to real property, which is neither consistent in its application nor permanent in its character, cannot be else than pernicious in practice, and therefore should be rejected. This much has been said in answer’to the arguments used, which endeavor to show that the Statute of 1797 will protect equitable possessors, as well as a younger grantee, and one in by a second deed, under the construction given to it in Lillard and Elliott, and the subsequent cases which followed that decision; and that therefore these decisions ought not to be departed from, because the construction is too narrow.
I shall lay it down as a general rule, that all acts of limitation operate inflexibly and upon principle, regardless of particular cases of hardship. Upon this principle was decided the case of Bree v. Holbeck, in Dougl. 655; and the case of Harris and Holmes v. Bledsoe’s Heirs, decided in 1821, by Judges Emmerson and Whyte, against Harris and Holmes, upon the Statute of 1797. A. Bledsoe, in his will, authorized his executors to sell lands in East Tennessee: they sold in West Tennessee, and the purchasers held fourteen years’ adverse possession under the deed from the executors. They paid a full and fair price to the executors, and after occupying the land fourteen years were turned out by the heirs, because the executors had no power to make the deed, upon the principle that a void deed is no deed upon which the Statute'can operate. Peck’s Rep. 234-261. This rule gave the heir the [416] money, and then the land. The case of Darby v. M’Carrol, Pollard, arid Reasons, is also a rigid case; for M’Carrol paid the debt of the ward to Neville, for the land, which was treated as a valid sale for three and twenty years. The heir, after his *696 debt is paid, sells out the same land to another, gets his pay a second time, and then the sale is treated as void, and M’Carrol turned out: and what is still harder, Pollard and Reasons, honest purchasers for a fair price, who had lived upon the land for twenty-three years, believing they had a good title, were also turned out; not for a fraud in fact, but for ignorance of the law. For, to say that these men (Pollard and Reasons) were wittingly cheating this infant child, would be sporting with our knowledge of how matters of this sort are transacted, even at this day. And in 1793, when the sale took place, it can be pretty safely alleged that no lawyer of that section of country suspected the sale to be otherwise than valid. That case further shows, that in 1812, after young Elliott was twenty-four years of age, he had the whole matter arbitrated, and a considerable sum of money was awarded him, and a tract of land from M’Carrol, which were actually paid. Yet, in 1816, he sells out his title upon speculation. This rigid rule turned out of house and home men who had lived half a lifetime'and more upon what they supposed their own lands. And had they lived fifty years longer it would have turned them off; for the fraud in law, for which their title is pronounced void, appears upon its face; and therefore the proof against them stands ready made.
The rule then contended for, is, that he who takes a deed from one having no title, with a knowledge that he is getting no estate, takes a fraudulent and void deed; and that a void deed is no deed. And there being no deed “ by virtue of which ” to hold possession, therefore it follows that the Act of 1797 does not operate. And their knowledge of all this will be implied, where the title-papers necessarily lead to it.
Who will this rule protect ? A younger grantee ? Let us try it. A younger grant is void; the person setting up a claim under it must know it, by implication of law, because [417] the true and older grant is of record.' He then takes a void title, knowing it to be so, is guilty of the same fraud M’Carrol was guilty of when he bought from Neville, who had no right to sell. Neville had no right and the State has no right. The younger grant, therefore, being a void grant, is no grant; and the possession holden, unprotected by the title required by the Act of 1797, viz. “ a grant.” For,, say these decisions, the possessor who relies upon the Statute must come in believing he has a good title; and where he sees, and is bound “ by the law to see ” that he has not the title, he acts fraudulently, as against the true owner. His pretended title is no title, and the Statute affords no. protection to such a possessor, at any length of time; and this rule, says Judge Whyte, in his opinion in the case of Pollard and Reasons, is adopted from the policy of the Legislature, which never, in the Act of 1797, meant by the words “deed of conveyance founded upon a grant,” a deed founded in fraud or mala fide. He declines giving any affirmative opinion upon these words, and concludes by laying down the principle *697 above, as superseding the necessity of any opinion upon the wording of the Statute. That this principle has all the effect there attributed to it is most clear.
Will this principle protect a seven years’ possession under a deed from A, where he had before conveyed the same land to B, and B’s deed registered ? C, who holds under the second deed, is - bound to know what is of record; and that B’s deed is there, the registration is lawful notice to him. With B’s deed before him, he takes a conveyance for the same land from A, who has no title, and takes possession. The deed in law is a fraudulent deed, and a void deed, and, according to Pollard and Reasons, “ no deed,” and affords no protection to the possessor. Nothing can be more simple than this unerring conclusion. What other cases will be protected by this construction of the Statute of 1797? The younger grantee, and the possessor under the second deed, are the only two cases, contended for by the advocates of the doctrine, laid down in the case under review; and that neither of these will be protected, I think is pretty clearly illustrated. I will only further remark, [418] that I am unable to think of any possible case of title not good in itself, that, under the construction in Darby’s Lessee v. Pollard and Reasons, would receive any aid from the Statute of 1797. In point of fact, the opinion is grounded upon the idea of a regular chain of legal title, good in itself; and, in my humble judgment, pronounced the Statute of 1797 a dead letter. Great respect is entertained for the gentlemen who gave the opinion, as judges and as men, and ever since it was pronounced, I have been trying to come to some conclusion more favorable to the correctness of that decision; but the more I examine it, the more thoroughly I am convinced that in effect it is a repeal of the Statute. All jurists, of every age and country, have holden that Statutes of Limitation ought to be liberally construed in favor of possessors. Shelby v. Shelby, Cooke, 184; Porter v. Cocke, Peck’s Rep. 46. Does the above construction afford the protection intended by the Legislature to be given to possessors ? If it results in the defeat of all possessions under void titles, which were acquired with a knowledge, constructively, that they were void, it must be unsound; for such possessions, it is believed, are almost the only ones needing the protection of the Act. This construction is therefore thought not liberal, but the reverse of it, to an alarming extent, and therefore ought to be rejected.
Having endeavored to show that the construction given to the 4th section of the Act of 1797, in the case of Darby v. Pollard and Reasons, is wrong, I will now state some additional reasons why I think the construction by me contended for is right.
It is a rule, in the construction of statutes, that if in their language they are obscure and doubtful, the best mode of ascertaining their meaning is to resort to the construction given thereto shortly after their passage, by the *698 sages of the law who lived about the time they were made; because they were best able to judge of the intention of the makers ; and that a contemporaneous exposition is most to be relied upon, for the purpose of finding out the meaning of the obscure and doubtful words. That the construction was, immediately after the passage of the Statute, substantially as [419] Judge Overton decides that it should be, in his opinion in Weatherhead and Douglas v. Bledsoe’s Lessee, is pretty satisfactorily shown from the statement made in that opinion. Judge Overton had resided in the State, as a practising lawyer, from the year 1789 to 1804, when he was appointed a judge of the superior courts; and, with the exception of one year, continued to be one of the judges of last resort in the State, until 1816, and a minute observer of every passing event connected with the policy or judiciary of the country. Indeed, the cases reported by him in 1 Tenn. Rep. fully prove that the Act of 1797 was not thought by the courts to require a connected chain of title. There are other very strong evidences in favor of this early construction. The county courts did much the greater part of the business of this State, from its earliest settlement to 1809, not to say afterwards. The justices of these courts were the legislators who passed the Act of 1797; and they had a sensible meaning, according to their judgment, affixed to it; and that this, in substance, was the same contended for by Judge Overton, is well known to those who have resided in this State ever since 1815. A good evidence of this is the construction given by the county courts and the old superior courts to the 3d section of the Act of 1797, which provides, “ That if any grantee or other person, claiming by a deed of conveyance, founded upon a grant, hath, by virtue thereof, obtained peaceable possession of any tract of land, and shall be turned off of the same by the true owner, he, the possessor, shall be paid for his improvements.” Here the very same words are employed as in the 4th section. Yet this section (3d) has, it is believed, uniformly received a different construction from that given to the 4th, in Darby v. Pollard and Reasons. That a loose paper patent, perhaps destroyed by time or accident, was a fit foundation for anything, was not so easily conceived by men whose ideas were derived almost exclusively from material objects. They therefore thought that if a man “ claimed by deed of conveyance,” founded upon the grant, or tract of land, of any other, and made valuable improvements, and the true owner stood by and permitted it, .that [420] he who built houses, made fences, and planted orchards should be paid for them, if the land was taken from him. That the words “ deed of conveyance founded upon a grant,” meant a deed founded or fixed upon a grant, or tract of land, without reference to the paper patent; and that therefore no connection of any sort with the grantee was necessary. This construction of the 3d section, it is believed, has never been departed from by any of the courts of this State.
*699 I would here remark that to all the decisions requiring a connection of title, since Judge Haywood has been upon the bench, he has uniformly dissented. And, at the sitting of the Supreme Court at Nashville, in 1823, the cause of Barton’s Lessee v. Shall, came on upon the naked question, whether a connection of title was required by the Act of 1797; when it was argued, with much energy on both sides, before Judges Haywood, Whyte, Brown, and Peck. Judge Haywood delivered the opinion, which is reported in Peck’s Rep. 215. Judge Whyte adhered to his former opinions, and Judges Brown and Peek took time to advise, until the next term, before which Judge Brown resigned, and at which time Judge Peck concurred with Judge Haywood.
The plaintiff in error, Gray, having had seven years’ possession, after G. S. Elliott came of age, is, in my opinion, clearly protected by the Act of 1797, unless there is something in the objection that he held for Elliott, ,and not adversely. Let us examine this point, which was earnestly urged upon the consideration of the Court, by the counsel for the defendant in error.
It is said that M’Carrol, as husband of the guardian of George S. Elliott, was entitled to the possession of young Elliott’s lands until he came of age; that his possession could not be an adverse possession, and that Gray stands in no better situation than M’Carrol, being a purchaser with notice (by implication of law) of M’ Carrol’s title, and of his relation to young Elliott; and, therefore, involved in all the legal consequences that attach to M’Carrol. 1 Plowd. 293, B.; 2 Bal. & Beaty, 272; 2 Sand. on Uses, 53, 63, 83; [421] 2 Sch. & Lef. 99; 1 Bur. 108; 5 Bur. 2604; 1 E. 568; 4 Johns. 390; 6 Johns. 34; 12 Johns. 182. Many other books and authorities were read and urged to prove this position. On the subject of the incapacity of the tenant to change the character of his possession, the New York books are strongest and most relied upon. The Statute of that State upon the subject of tenancy has this provision: “That no attornment of a tenant, to a stranger shall be construed in any wise to have changed, altered, or affected the possession of the landlord, except the same be made with the consent of the landlord ” ; an extract from which will be seen in the case of Jackson v. De Lancy, in 13 Johns. 553. The courts of New York have then been following their Statute, which, in this respect, is plain upon its face; and perhaps we would do well to profit by their example. For I think it was hardly contemplated by the Assembly of 1797 that the plain agricultural men of this State should be involved in the feudal learning of seisins, disseisins, and feoffments, which have been obsolete in England for centuries ; and as we are told by Lord Mansfield, in the casé of Hard and Others, in 1 Burrow, were not understood in that country. I am very sure they have never been bétter understood in this. I have examined the Statute of West. 2d, ch. 25, 2 Inst. 409, which says: *700 “ In case the guardian alieneth in fee the ward’s land, the remedy of the heir shall be by novel disseisin, and the feoffor and feoffee shall be held for disseisors.” Much pains has been taken to find out what the effect of the disseisin spoken of in the Statute of West. 2 is, in reference to this cause, but without much success. Lord Coke, in 1 Inst. 153, says, “A disseisin is when one enters, intending to usurp the possession and to oust another of his freehold; or is the putting out of a man out of seisin, and implieth a wrong.” See Cro. Car. 303, Blunden v. Vaugh. In his reading upon the Statute of West. 2, ch. 25, in 2 Inst. 413, he says : “ The Statute extend-eth to guardians in socageand if a tenant for years, or a guardian make a lease for life, the remainder for life, the remainder in fee, and tenant for life enter, he is a disseisor, because he taketh the first livery; [422] and so it is of him in remainder, or in fee, if he enter.” And further, he say-eth: “ How can the heir have a writ of entry, suppose the entry by the guardian ? To this it is answered that albeit it be a disseisin, having regard to the heir for the benefit of the assize, yet between the guardian and feoffee it is a feoffment, whereunto a warranty may be annexed, and voucher had of them to recover in value, &c. And it will be seen by 1 Inst. ch. 15, § 679; 7 Ba. Ab. 237, Warranty L., that a deed with' warranty always binds the warrantor himself, and bars him of the land warranted forever; that it hinds his heirs in most cases, and his executors in all, is well-established law; and, as between the grantor and grantee, the deed is indisputable and valid to every intent. Yet it is most earnestly contended that M’Cai;rol had no power to make a deed, because he made it of his ward’s land, having no- estate; that therefore it is a fraudulent deed, and therefore a void deed, and therefore no deed. This consequence could only have been arrived at by logical deduction; for certainly the ancient law is, that a feoffment, as between the grantor and grantee, or M’Carrol and Gray, was good; and as much a deed as if M’Carrol had been the grantee of the land conveyed. Yet we are referred to the ancient law for the above doctrine, but, by which we find that when a guardian enfeoffs a stranger in fee, of the ward’s land, that this deed between the guardian and stranger is a valid feoffment; that the delivery of possession by the guardian to the feoffee is a disseisin by the latter of the heir; that a disseisin is the ousting and putting out of the heir from his possession and freehold, and a taking possession by the feoffee, for himself in fee, by virtue of the deed or feoffment.
1st. Gray, then, took possession of the land by a “ good deed,” as between him and M’Carrol. 2d. He took ¡Dossession as feoffee, or “ by virtue of the deed.” 3d. He ousted the heir’s possession, and took “ and held adversely ” for himself. And, 4th. He held “ peaceably ” for seven years. This is what the Statute requires.
On turning to the Statute of 1797 itself, however, it is found perfectly *701 plain upon the nature of the possession required [423] by its provisions. Says the Act: “ In all cases where any person shall have had seven years’ peaceable possession of any land, by virtue of a deed of conveyance,” then he shall be protected. The 3d "section says, “Where any person hath by virtue of a deed obtained possession, he shall be paid for improvements.” They both mean the same, doubtless. Then, had Gray a deed? He had. The deed was regularly executed between him and M’Carrol for the land in controversy; and if good as between them, for any purpose, was such a deed as the Statute would operate upon. Did Gray take peaceable possession of the land by virtue of the deed of conveyance ? That he meant to do so, is not denied. If, then, the quo animo of Gray was to take and hold for himself, by virtue of the deed, he is clearly within the plain and unambiguous words and meaning of the Statute,- having had seven years’ peaceable possession, by virtue of a deed. If, really, M’Carrol, the guardian (as he is styled) was in, as the “ tenant ” of George S. Elliott, and he transferred that possession to Gray, then the latter ought not to have been permitted to dispute the title of his landlord, on the trial in ejectment; and all question about the Statute protecting him is at an end. In 1804 Gray bought from M’Carrol the 227 acres of land in dispute, and paid $ 2,000 for the same, — no doubt a very high price, — and got a general warranty deed, which he believed to be a good title. This had nothing of the character of a tenancy in it, and to treat it as such would violate the words of the Statute. This doctrine is supported by the decisions of the Supreme Court of the United States, in the cause of Blight’s Lessee v. Rochester, 7 Wheat. 335; Richard v. Williams, 7 Wheat. 120. In the latter, a tenant in common took possession and ousted his cotenant, by holding for himself; and the Court decided he was protected by the Statute of Connecticut; and who, in principle, was in M’Carrol’s situation, supposing he had really been guardian, and the sheriff’s sale never taken place.
In Connecticut the principles in this case are fully recognized. In Bryan v. Atwater, 5 Doug. 181, the guardian gave a bond to the defendant that the ward would convey [424] when he came of age. The ward refused at twenty-one, but left the defendant in possession fifteen years, the term of limitation in that State. The Supreme Court held the title of At-water adverse, and protected. So in Griswold v. Butler, 3 Con. Rep. 227. A man, rendered non compos by age and infirmity, was put under a guardian, who sold the land and got the man in his keeping to sign the deed, which was pronounced clearly void. Yet the Court took the land from the heir, who is also an idiot; 1st, deciding that the defendant held ad-; versely; and, 2dly, that the accumulative disability could not be relied upon. To this latter, two judges dissented. The Statute of Connecticut is almost a literal copy of our Act of 1715. The above principles are also *702 recognized in tbe cause of Waterhouse v. Martin, in Peck’s Rep. 392, 397.
The cause of Walker v. Turner, 9 Wheat. 541, has been strongly urged upon the Court. No man has more respect for the decisions of that Court than I have, and upon all questions arising upon constitutional or international law, upon the statutes of the United States, or upon commercial questions, its decisions ought to he adopted by the State courts. But in the case of Walker v. Turner, that Court, as it should have done, felt itself bound by the decisions of the courts of this State, and followed the decisions now overruled.
I am happy to add that the present opinion upon the Act of 1797 is consonant to justice in this particular cause, and also consistent with good policy. It is but just that the ward (young Elliott) should go against M’Carrol, standing in the relation of guardian to him, upon the guardian bond given by the wife, because M’Carrol paid a part of young Elliott’s debt, by his purchase at the execution sale, which could be settled justly in a suit between the guardian and ward; and because young Elliott has slept many years upon his rights, as against Gray. It is pursuant to sound policy not to permit the lessor of the plaintiff to turn Gray out of possession, because this would multiply lawsuits by compelling Gray to sue M‘Carrol upon the clause of warranty in his deed. And, secondly, perhaps the next [425] day after Gray was turned out of possession he would sue the lessor of the plaintiff upon the 3d section of the Act of 1797, for the value of the houses, orchards, and other valuable improvements made upon this tract of land, by the defendant, in the last twenty years, for which he would not fail getting the verdict of a jury. And probably at the next term of this Court in 1826, would again be presented to the Court by the lessor cf the plaintiff, the question of what the Legislature did mean by the words “ deed of conveyance founded upon a grant,” used in the 3d section of the Act. And if the decisions made in the cases of Pollard v. Seasons, and Harris and Holmes, were now settled as the law, many causes of the above description would present themselves; when, if the Court decided with consistency, they must say that Gray’s deed was a fraudulent and void deed, and therefore “ no deed.” He, having no deed, could not claim for improvements under the 3d section, which, in plain words, requires a deed. The consequence would be that Gray would lose his $2,000,— perhaps all the money he could possibly command, — his little tract of 227 acres of land, the labor of twenty-one years, the expenses of two protracted lawsuits; and, debilitated by age, reduced to poverty, would be compelled to seek his fortune anew. The situations of Harris and Holmes, and Pollard and Seasons, were still more aggravated. For in both these cases the heirs have gotten a full and fair price for the land at the time it was sold ; and the money being applied to their use. Next, they took the land; and *703 thirdly, the improvements ; and in the fourth place, the costs of the suits. That the same words, in the same Statute, referring to the same state of facts, should receive the same construction, seems to my mind conclusively to follow. And how the Court could do otherwise than reject the application for improvements, under the 3d section of the Act of 1797, it is impossible for me to conceive, were they to follow the decisions in Harris and Holmes, and Pollard and Reasons. We had better, upon this branch of the Statute, adhere to the old and plain doctrine, heretofore held forth by the courts of the country, which ever has been “ that where A settles [426] down by virtue of a deed upon the grant of B, who stands by and sees A make valuable improvements without stopping the same by suit, that B shall pay for such improvements, although the deed A claims under has no connection with the grant of B. I think this the correct construction of the 3d section of the Act of 1797, and the 4th ought to receive the same; that judgment should be reversed and entered for the plaintiffs, Reader and Gray.
Peck, J. and Williams, J. concurred with Cate on, J. Whyte, J. dissenting; see his opinion on the same point in Harris and Holmes v. The Lessee of Bledsoe’s Heirs, Peck’s Rep. 234. Haywood, J. did not sit in the above cause; see his opinion on the same point in Barton’s Lessee v. Shall; Porter’s Lessee v. Cocke; Peck’s Rep. 215-230; Darby’s Lessee v. M’Carrol, Pollard, and Reasons, 5 Hayw. 288.
Note. — This case terminated the long conflict over the proper construction of 1797, 43, 4. The list of cases on the subject given by Mr. Meigs in his Digest, page 746, will afford some idea of the length of the struggle and the interests involved. The whole of this learning has been rendered useless by the Act of 1819, 28, Code 2763-2766. See editor’s note to Weatherhead v. Bledsoe, 2 Tenn. 352. See also Judge Peck’s depre-ciatory allusion to this case in his dissenting opinion in Neal v. E. T. College, 6 Y. 205. — Ed.